Filed 4/3/14  P. v. Provencio CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALFREDO PROVENCIO,<br><br>    Defendant and Appellant. | F065755<br><br>(Super. Ct. No. 11CM3202)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Robert S. Burns, Judge.

J. Peter Axelrod, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Rachelle Newcomb, Leanne Le Mon, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Alfredo Provencio of continuous sexual abuse of a child and exhibiting harmful matter to a child, in violation of Penal Code sections 288.5, subdivision (a), and 288.2, subdivision (a),[1] respectively. He argues (1) his constitutional rights were violated when he was interviewed by police officers, (2) the trial court erred in instructing the jury, and (3) there was not substantial evidence to support the jury's finding that he caused bodily harm to the victim within the meaning of section 667.61, subdivision (a). We reject each of these arguments.

We agree, however, with Provencio's claim that there was not substantial evidence to support the conviction for exhibiting harmful matter to a child because the prosecution failed to present sufficient evidence of the content of the videos Provencio apparently displayed to the victim. Accordingly, we will reverse the conviction for violation of section 288.2, but otherwise affirm the judgment.

### FACTUAL AND PROCEDURAL SUMMARY

#### *The Information*

The information originally contained 23 counts. The trial court granted the prosecution's motion to dismiss five of the counts before the matter was submitted to the jury. The jury considered 16 counts of molestation related to five different incidents described by the victim. Specifically, there were six counts charging Provencio with violating section 288, subdivision (a), and separate counts alleging Provencio violated each of the following sections once: sections 269, subdivision (a)(1), (3), (4), (5), 288, subdivision (b)(1), 288a, subdivision (c)(1), (2)(B), 286, subdivision (c)(2)(B), 261, subdivision (a)(2), and 289, subdivision (a)(1)(B).

In the alternative, the information charged Provencio with continuous sexual abuse of a child, in violation of section 288.5, subdivision (a). Finally, Provencio was charged with exhibiting harmful material to a child, in violation of section 288.2, subdivision (a).

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

The information also alleged two enhancements. Several counts alleged Provencio personally inflicted bodily harm as defined in section 667.61, subdivision (a). The second enhancement alleged Provencio had suffered a prior conviction that constituted a strike within the meaning of section 667, subdivisions (b) through (i).

### *The Testimony*

The victim (Victim) testified she was 14 years old at the time of trial. Her first sexual encounter with Provencio occurred shortly after she and her family moved into an apartment with him when she was approximately seven years old. The family had purchased an air mattress for camping, and Victim wanted to sleep on it in the living room. Sometime during the night Provencio joined her on the air mattress. Victim woke up in the middle of the night and discovered Provencio touching her vagina underneath her underwear. After a few minutes, Victim rolled onto her side, got up, went to the bathroom, and then joined her mother in bed.

Approximately one year later, Victim and Provencio were in the bedroom he shared with Victim's mother. The two were playing around and making jokes. Suddenly, Provencio stated he wanted to "nail [Victim] so bad." He then started touching her body, including her breasts and genital area. She attempted to push him away, but he would not stop. He stopped when Victim's mother returned home.

After this second incident, the molestation happened more frequently and eventually escalated. Victim was able to relate an incident that occurred when she and her brother spent the night in a tent in their backyard. She awoke in the middle of the night to find Provencio next to her removing her pants. He rubbed her vagina with his fingers and placed his finger inside it. He also rubbed his penis against her vagina and then inserted his penis into her vagina. When he finished, Provencio left the tent.

The events of molestation continued and eventually escalated into nightly abuse. Provencio started telling Victim what he wanted her to do to him and how to do it. His requests included instructing her to copulate him orally. He also would copulate her

3.

orally. She explained that whenever she wanted money to buy things, he would demand a sexual encounter before he would give it to her.

Victim testified Provencio sodomized her "almost every time." She claimed that every time he sodomized her it was painful. A few times after being sodomized, she would bleed, and it would hurt to walk for a few days.

Victim also testified to incidents where her arms were bruised by Provencio. She explained that she attempted to get away from him when he wanted to sodomize her. He would grab her arms and push her back onto the bed. The force used by him to restrain her left bruises. This type of incident occurred often.

Two nights before Victim reported the molestations to the police, Provencio had intercourse with her. She did not report the molestations for a long time because she was scared. Provencio told her that if she ever told anyone about the molestation, he or his friends would hurt her, her brother, and her mother. He also would take things away from her if she made him angry and threatened that the family would end up on the streets if he was arrested. She finally confided in her godmother because Provencio began verbally and physically abusing her brother and mother.

Finally, Victim described an occasion when she watched pornography with Provencio. She was watching television when he called her over to see something on his computer, which turned out to be pornographic videos. She tried to walk away, but he pulled her back and made her watch the videos. She remembered the girls in the video were dressed in provocative Valentine's Day or Christmas Day themed clothes.

Victim described a bottle of lubricant used by Provencio and described where he stored the bottle. Investigating officers located the bottle of lubricant in the location described by Victim. Investigating officers also found black underwear in Victim's bedroom in the location she described after her last encounter with Provencio.

DNA testing of a biological stain found on the underwear located two male contributors. Analysis of the major contributor was consistent with Provencio and other

4.

males who were related to Provencio. In terms of probability, the sequence obtained from the sample would occur in one in every 942 African-Americans, one in every 704 Caucasians, and one in every 572 Hispanics.

Lucy Sager, the nurse examiner for the Sexual Assault Response Team, examined Victim. Sager found bruising on the back of Victim's upper right thigh, although she could not determine if the bruising was related to a sexual assault. She noted redness and tenderness in one part of the vaginal area that was the result of an object rubbing the area, possibly caused by a sexual assault. In another part of the vaginal area she observed a laceration of recent origin. She observed scarring to the perineum, indicating there had been some type of trauma, possibly multiple traumas, resulting in multiple healed injuries. She observed redness and tenderness in the anal area. There also were bruises on Victim's buttocks. These injuries were consistent with the history described by Victim, although the injuries could have been caused by a mechanism other than a sexual assault.

Robert Waggle, an investigator for the district attorney's office, examined various electronic devices related to Provencio. The first was a memory stick that was removed from a portable gaming device. Waggle found two files that contained adult pornographic videos. On a flash drive Waggle found several pornographic video files, including one that suggested a Valentine's Day themed video and another that contained a Christmas Day themed video. Other files depicted a boy sleeping with his friend's mother, girl-on-girl videos, and a girl sleeping with her friend's brother. Waggle described the videos as "Complete hardcore porn." An external hard drive contained a password-protected file entitled "O.K. Raiders" that contained adult pornographic videos.

Provencio testified in his defense. He denied ever having sexual contact with Victim and explained some of the incidents in a manner that did not involve sexual contact. He also explained the pornography found on his computer paraphernalia, but he

denied ever having shown it to Victim. Outside the presence of the jury, Provencio admitted his prior strike conviction.

### Closing Arguments

The prosecution suggested the jury focus on the continuous sexual abuse of a child allegation. If the jury found Provencio guilty of that count, it could ignore the individual charges. The prosecution then asserted there was more than ample evidence that Provencio committed more than three acts of molestation over a period in excess of three months.

Defense counsel argued Victim fabricated the charges, essentially parroting the testimony she had heard on a television news program. In addition, defense counsel argued there was insufficient evidence Victim had suffered bodily harm within the meaning of the enhancement.

### Verdict and Sentencing

The jury accepted the prosecutor's suggestion and found Provencio guilty of continuous sexual abuse of a child, in violation of section 288.5, subdivision (a), and exhibiting harmful material to a child, in violation of section 288.2, subdivision (a). The jury also found true the allegation that Provencio had inflicted bodily harm within the meaning of section 667.61, subdivision (a).

The trial court sentenced Provencio to a term of 50 years to life for the continuous sexual abuse of a child count. The term for this count starts with a triad of six, 12, or 16 years. This term was increased to 25 years to life pursuant to section 667.61 because the jury concluded Provencio personally inflicted bodily harm on Victim, who was under the age of 14. (*Id.*, subds. (a), (c)(9), (d)(7).) The term was then doubled because Provencio admitted he had a prior conviction that constituted a strike within the meaning of section 667, subdivisions (b) through (i). The sentence on the remaining count was imposed concurrently.

6.

# DISCUSSION

## *Miranda[2] Violation*

Provencio was interviewed by the police after Victim reported the molestation. This interview was recorded with audio and video equipment. Much of the interview was not relevant to the proceedings. After about one hour, however, the interrogating detective accused Provencio of molesting Victim. Seconds after the accusation, Provencio invoked his right to counsel and the interview was terminated.

When the interrogating detective accused Provencio of molesting Victim, Provencio nodded his head. The prosecution contended these movements were an admission and elicited this information from the interviewing detective at trial. Provencio objected to this testimony, asserting he was in custody, and the nods were part of his invocation of his constitutional rights pursuant to *Miranda*. The trial court overruled the objection after an Evidence Code section 402 hearing and after viewing the videotape of the interview. Defense counsel, for tactical reasons, then decided to introduce the entire invocation process to put the nods of Provencio's head into context.

Provencio contends the trial court erred when it permitted the prosecution to elicit evidence that he nodded his head, relying on the same two grounds as urged in the trial court. "'In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' [Citation.]" (*People v. Thomas* (2011) 51 Cal.4th 449, 476.)

Provencio's first argument is that he was in custody at the time he nodded his head. "'An interrogation is custodial, for purposes of requiring advisements under

---

[2]*Miranda v. Arizona* (1986) 384 U.S. 436.

7.

*Miranda*, when "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" [Citations.] Whether a person is in custody is an objective test; the pertinent question being whether the person was formally arrested or subject to a restraint on freedom of movement of the degree associated with a formal arrest. [Citation.]'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1167.)

The only witness to testify at the Evidence Code section 402 hearing was the detective who interrogated Provencio. He testified Provencio was contacted in the front yard of his home as he returned from work. The detective identified himself as a police officer and was displaying a badge and weapon. He asked Provencio if he would be willing to come to the police department to discuss "an allegation." Provencio agreed and was transported in a police car to the police station. He was not placed in handcuffs.

The interrogating detective met Provencio in the interrogation room at the police station for the interview, which was recorded.[3] At the beginning of the interview, the detective advised Provencio he was not under arrest and that he was free to leave at any time. The two then engaged in a conversation that was not adversarial, nor which suggested Provencio could not leave. This tone continued until the detective left the room for a short time. Up to this point, Provencio concedes he was not in custody for *Miranda* purposes.

When the detective returned to the room, he was accompanied by a second detective who took a seat near the back wall, away from the door. At this point the interrogating detective accused Provencio of molesting Victim, with the accompanying nodding of the head by Provencio. The issue is whether the change in tenor and the presence of the second detective converted this consensual interview into a custodial interrogation. We conclude that Provencio was not in custody.

---

[3]We have reviewed the recording of the interview.

8.

Comparison of the facts in this case to those in *People v. Moore* (2011) 51 Cal.4th 386 (*Moore*) explains our conclusion. Moore's neighbor was murdered, and it appeared to investigating officers that Moore had knowledge relevant to the crime. Moore initially was interviewed in a patrol car because his trailer did not have heat or electricity. Although the detectives were armed and in uniform, and the doors to the patrol car were closed and locked, the Supreme Court concluded Moore was not detained. The Supreme Court observed that Moore was asked to give a statement as a percipient witness, and he readily agreed to do so. (*Id*. at p. 396.)

At the end of the interview in the patrol car, the investigating officer requested Moore come to the police station to give a detailed statement. Although somewhat reluctant, Moore agreed to do so. He was driven to the police station in a patrol car. During the ride Moore conversed with the police officer driving him, and there was some discussion related to the investigation, generally instigated by Moore. The Supreme Court concluded Moore was not in custody during the drive. "[The officer] did not interrogate defendant during the ride; defendant was at the least an equal partner in initiating and maintaining the conversation, which ranged widely in subject matter. On arriving at the station, defendant sought confirmation that the officers only wanted a statement and would drive him home afterward. Receiving that confirmation, he again agreed to give the statement. Nothing indicates defendant thought he was not free to leave during the ride to the station, and no reasonable person would have thought so in these circumstances." (*Moore, supra,* 51 Cal.4th at pp. 397-398.)

Once Moore arrived at the police station, he was placed in an interview room to give a recorded statement. Moore was not handcuffed or otherwise restrained. Two detectives were in the room when Moore was interviewed. Moore was informed he was not under arrest, was free to leave, and was at the station to give a statement as a percipient witness.

9.

The detectives then began to ask Moore about the victim, her family, and any other relevant information he may have had about the murder. Both detectives joined in questioning Moore. Eventually, the detectives asked Moore about his past drug use and prior arrests. Moore was asked if he had burglarized the victim's residence. Detectives then began asking questions suggesting Moore was in the victim's residence before the murder and might have direct knowledge about the murder. Moore answered each of these questions in the negative, but he admitted he carried a stick with him as a walking aid.

Up to this point, it appears Moore had not been informed the victim had been murdered. When he was informed, Moore denied any involvement. The questioning continued along a line suggesting Moore had murdered the victim, including questions about a knife Moore carried with him. Detectives asked for permission to search Moore's trailer to find the knife, but Moore refused, stating he would retrieve the knife for the detectives when he returned home.

Detectives continued to question Moore in a manner that suggested they suspected him of murdering the victim, perhaps when she surprised him while he was burglarizing the residence. Moore denied the accusation and asked if he was under arrest. The detectives stated he was not under arrest. Moore asked for a ride home, but the detectives continued questioning Moore about the murder. Moore continued to deny any involvement in the murder and again asked for a ride home. The detectives then instructed Moore to return to his seat and asked if he would volunteer his clothes to be checked for evidence. Moore agreed to this proposition. Moore again asked for a ride home while waiting for someone to collect his clothes. The detectives told Moore they would give him a ride home after they collected his clothes but continued to question him about his possible involvement in the murder. Moore's clothes were collected and his body photographed, with the detectives pointing out scratches and bruises to be photographed. Moore again was asked if he was involved in the victim's death and again

10.

he denied any involvement. The detectives instructed Moore to sit down and informed him he would be taken home as soon as a patrol officer could be found to give him a ride.

The questioning continued about various topics and then the detectives left the room. One detective testified that at this point he was informed that evidence from the crime scene connected Moore to the murder, including property from the victim's residence recovered from Moore's trailer. This detective then returned to the interview room and asked Moore if he would allow technicians to swab his hands. Moore refused and demanded a ride home. He refused a further request to stay at the station voluntarily. The detective then told Moore he could not go home and informed him of his constitutional rights pursuant to *Miranda*.

> "We agree with the trial court that the sheriff's station interview did not, in its entirety, constitute custodial interrogation. As already discussed, defendant, the last person known to have seen the victim and obviously an important witness, was asked—and freely agreed—to come to the station to give a statement. In context, [the detective's] statement that 'we have to do [it] now' rather than the next day clearly referred only to the importance of getting information promptly and did not convey a command that defendant go to the station. On arriving at the station, defendant asked whether, and was again assured, he was there only to give a statement. Once in the interview room at the station, [the detective] expressly told defendant he was not under arrest and was free to leave. Defendant said he understood. Defendant was not handcuffed or otherwise restrained, and there was no evidence the interview room door was locked against his leaving. The interview was fairly long—one hour 45 minutes—but not, as a whole, particularly intense or confrontational. The interview focused, initially, on defendant's encounter with [the victim], the missing fence boards, and information defendant might have had about the man he reported seeing in [the victim's] backyard or others connected with [the victim's family]. For a substantial period, while defendant filled in his previous statements with details, the questioning did not convey any suspicion of defendant or skepticism about his statements.

> "After a while, to be sure, the detectives interjected some more accusatory and skeptical questions, with [one detective] asking defendant straight out, 'Did you burglarize the house?' and, later, urging him to begin being 'honest with me.' The detectives' questions about defendant's prior

11.

arrests, drug use, need for money, and carrying of a knife and other weapons on the day of the crimes conveyed their suspicion of defendant's possible involvement. But *Miranda* warnings are not required 'simply because the questioning takes place in the station house, *or because the questioned person is one whom the police suspect.*' [Citation.] While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody. [Citation.] At least until defendant first asked to be taken home and his request was not granted, a reasonable person in defendant's circumstances would have believed, despite indications of police skepticism, that he was not under arrest and was free to terminate the interview and leave if he chose to do so." (*Moore, supra,* 51 Cal.4th at pp. 402-403.)

As Provencio concedes, nothing that occurred prior to the break converted this voluntary interview into a custodial interrogation. Undoubtedly, after the break, the detective's accusatory statement (I know you molested Victim, I am just trying to determine why) certainly conveyed to Provencio that at a minimum he was a suspect. That statement, in and of itself, however, did not convert the interview into a custodial interrogation. Provencio voluntarily came to the police station to be interviewed. He was told he could leave at any time and there was no apparent restriction on his ability to do so, even though he did not try to do so. He was not placed in handcuffs, nor did the door appear to be locked.

Nor did the presence of the second detective convert the interview into a custodial interrogation. The second detective entered the interview room after the break, sat down, and did not appear to participate in any aspect of the interview until after Provencio requested an attorney. No reasonable person immediately would believe he or she was in custody simply because two detectives entered the room instead of one detective.

As stated in *Moore*, police expressions of suspicion without other evidence of restraint on a person's freedom of movement do not necessarily convert a voluntary interview into a custodial interrogation. (*Moore, supra,* 51 Cal.4th at p. 403.) The complete absence of restraint on Provencio's movement, along with police assurances,

12.

would not cause a reasonable person to believe he or she was under arrest and could not terminate the interview and leave. Accordingly, as in *Moore*, we conclude Provencio was not in custody and *Miranda* warnings were not necessary.

Provencio's second argument is that his nodding of the head was part of his request for an attorney and therefore inadmissible. We do not agree.

We have reviewed the recording of the interview and conclude there are only two possible interpretations of the nods of the head by Provencio. One interpretation is an acknowledgment that the charges were true as suggested by the prosecution. The more likely interpretation is that Provencio was acknowledging what the detective was saying, not agreeing with the statements. Even though Provencio requested an attorney shortly after nodding his head, we cannot see any logical path that would lead to the conclusion that the nods of the head were a request for counsel.

Our analysis means the nodding of the head is admissible and its import is for the jury to decide. We thus reject this argument along with the first one and conclude the trial court's ruling was correct.

### Instructional Error

Provencio was charged with continuous sexual abuse of a child, in violation of section 288.5, subdivision (a). The trial court instructed the jury on this count pursuant to CALCRIM No. 1120. This instruction informed the jury that to convict Provencio of this offense, the jury must find (1) Provencio lived with Victim, (2) he engaged in three or more acts of substantial sexual conduct or lewd and lascivious conduct with Victim, (3) three or more months passed between the first and last acts, and (4) Victim was under the age of 14 at the time of the acts. The instruction also defined "substantial sexual conduct" and "lewd and lascivious conduct" for the jury.

Provencio's argument focuses on the element of intent required to commit a lewd and lascivious act. CALCRIM No. 1120 informed the jury that "*Lewd or lascivious*

13.

*conduct is* any willful touching of a child *accomplished with the intent to sexually arouse* the perpetrator or the child." (Italics added.)

The trial court also instructed the jury with CALCRIM No. 252. The relevant portion of this instruction informed the jury that continuous sexual abuse of a child required a general criminal intent and also informed the jury that to find Provencio guilty of this crime, he "must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime." Provencio asserts these two instructions conflict on the issue of intent. We disagree.

The error in Provencio's argument is that he confuses the intent required to violate section 288.5 with the intent required for *one of the elements* the jury must find exists to convict a defendant of violating section 288.5. To violate section 288.5, a defendant must commit each of the elements as explained in CALCRIM No. 1120: (1) the defendant must live in the same home as the victim, (2) the defendant must engage in three or more acts of substantial sexual conduct with the victim or lewd and lascivious acts with the victim, (3) the length of time between the first act and the last act must be three or more months, and (4) the victim must be under the age of 14 when the acts occur. The intent required to violate each of these elements is referred to as general intent, i.e., the intent to commit the acts without any further intent required.

The second element of the crime required the jury to find Provencio committed three or more lewd and lascivious acts with Victim or three or more acts of substantial sexual conduct with Victim. If the jury focused on whether Provencio committed three or more lewd and lascivious acts with Victim, the jury would have to find that those acts were committed with the specific intent to arouse either Provencio or Victim sexually. (*People v. Whitham* (1995) 38 Cal.App.4th 1282, 1293.) On the other hand, if the jury focused on substantial sexual conduct when considering the second element of the crime,

14.

there was no requirement that the conduct be committed with the specific intent to arouse either Provencio or Victim sexually.  The mere act of oral copulation, sodomy, insertion of an object in the vagina of either the perpetrator or the victim, or masturbation of either the victim or the perpetrator constitutes substantial sexual conduct within the meaning of section 288.5.  (*Whitham,* at p. 1293.)  The instructions provided to the jury adequately explained these concepts.  There was no error.

### *Sufficiency of the Evidence*

Provencio raises two challenges to the sufficiency of the evidence.  He claims the jury's finding on the bodily harm enhancement must be vacated, and the section 288.2 conviction must be reversed.

### Standard of Review

To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.  (*People v. Maury* (2003) 30 Cal.4th 342, 403.)  The record must disclose substantial evidence to support the verdict, i.e., evidence that is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*Id.* at p. 396.)  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury reasonably could have deduced from the evidence.  (*People v. Boyer* (2006) 38 Cal.4th 412, 480.)  "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]"  (*Maury*, at p. 403.)  A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis

15.

whatever is there sufficient substantial evidence to support'" the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### Bodily Harm Enhancement

The jury found true an allegation that Provencio personally inflicted bodily harm on Victim within the meaning of section 667.61. This section provides that a defendant who commits a sex offense that is listed in subdivision (c) of the section will be subject to a sentence of 25 years to life if specific circumstances listed in subdivisions (d) and (e) are found to be true. Subdivision (a) of the section provides that for the enhanced sentence to apply, the jury must find true either one or more of the circumstances listed in subdivision (d) or two or more of the circumstances listed in subdivision (e). Continuous sexual abuse of a child is one of the listed sex offenses (§ 667.61, subd. (c)(9)), and personal infliction of bodily harm on a victim under 14 years of age is one of the circumstances listed in subdivision (d) (§ 667.61, subd. (d)(7)).

"Bodily harm" is defined in subdivision (k) of section 667.61 as "any substantial physical injury resulting from the use of force that is more than the force necessary to commit an offense specified in subdivision (c)." Provencio argues the jury's finding that he inflicted bodily harm on Victim was not supported by substantial evidence, and thus the enhanced sentence must be vacated and he must be sentenced pursuant to the provisions of section 288.5.

The testimony related to the injuries sustained by Victim was limited to that of Victim and Sager, the nurse who conducted the forensic examination. Victim testified that when Provencio sodomized her, it was painful. She had pain when she walked for a few days, and there was some bleeding after the event. She also testified that on one occasion she attempted to escape Provencio when he was molesting her, but he grabbed her by the arms and threw her to the bed. This event left bruises on her arms.

Sager testified she found some bruising on Victim during her examination, but she could not determine if it was related to an assault or not. She also noted tenderness and a

16.

laceration in the vaginal area that could be related to a sexual assault. Similarly, she noted redness and tenderness in the anal area that could be related to a sexual assault. Finally, she observed scarring to the perineum, indicating some type of trauma that could be related to a sexual assault.

While this testimony was not overwhelming, we conclude it was sufficient to support the jury's finding that Provencio inflicted substantial physical injury on Victim. While there are no cases directly on point, we find guidance in section 12022.7. This section, in part, enhances a sentence if the defendant "inflicts great bodily injury on any person other than an accomplice" during the commission of a felony. (*Id.,* subd. (a).) The term "great bodily injury" is defined by the statute as "a significant or substantial physical injury." (*Id.,* subd. (f).) Thus, the Legislature had defined "great bodily injury" in section 12022.7 using essentially the same term as it used to define "bodily harm" in section 667.61. Accordingly, we find instructive those cases that have interpreted the term "great bodily injury" as used in section 12022.7.

In *People v. Washington* (2012) 210 Cal.App.4th 1042, 1047, the court noted that a finding of great bodily injury will be sustained when there is "some physical pain or damage, such as lacerations, bruises, or abrasions." The *Washington* court cited *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836-837 (*Jaramillo*) and *People v. Sanchez* (1982) 131 Cal.App.3d 718, 733 (*Sanchez*) to support its statement.

In *Jaramillo* the defendant struck her young daughters with a wooden stick 18 to 20 inches long and about one inch in diameter. One daughter "suffered multiple contusions over various portions of her body and the injuries caused swelling and left severe discoloration on parts of her body. The injuries were visible the day after infliction to at least two lay persons …. Further, there was evidence that [the daughter] suffered pain as a result of her injuries because a day later she had a 'look of anguish' on her face and she flinched or turned away from a simple guiding touch on the shoulder … and [the daughter stated] 'it hurt' as [she] walked to the nurse's office." (*Jaramillo,*

17.

*supra,* 98 Cal.App.3d at p. 836.)  Concluding the issue "might be close," the appellate court concluded there were sufficient facts to support the finding.  (*Ibid*.)

In *Sanchez,* this court described the victim's injuries as "*multiple* abrasions and lacerations.  She had one long scratch diagonally across her back and numerous bruises and small lacerations on her neck.  She had a serious swelling and bruising of her right eye and a markedly swollen left cheek." (*Sanchez, supra,* 131 Cal.App.3d at p. 733.)  Relying primarily on *Jaramillo, w*e held this evidence was sufficient to support a great bodily injury enhancement.

Additional guidance is found in two Supreme Court cases.  In *People v. Escobar* (1992) 3 Cal.4th 740, the defendant raped the victim, causing her to suffer "multiple abrasions to her thighs, knees, hips and elbows.  Several photographs introduced at trial revealed raw and bloody asphalt burns and bruises over various parts of her body.  [The victim] testified that her neck hurt so badly after the attack that she could not move it.  Vaginal pain prevented her from walking without impairment for more than a week.  A police employee testified that when [the victim] reported for an interview six days after the assault, she appeared injured, walked with a very heavy limp, and required the assistance of two friends, one on each side, to help her." (*Id*. at p. 744.)  The Supreme Court, in overruling one of its earlier cases,[4] held the evidence of "extensive bruises and abrasions over the victim's legs, knees and elbows, injury to her neck and soreness in her vaginal area of such severity that it significantly impaired her ability to walk" was sufficient evidence to sustain the great bodily injury finding.  (*Escobar,* at p. 750.)

In *People v. Cross* (2008) 45 Cal.4th 58, the defendant had repeated sexual intercourse with his stepdaughter, resulting in her becoming pregnant.  The defendant encouraged the victim to get an abortion, which she did with the defendant's assistance.  The Supreme Court explained that "Proof that a victim's bodily injury is 'great'—that is,

---

[4]*People v. Caudillo* (1978) 21 Cal.3d 562.

significant or substantial within the meaning of section 12022.7—is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury. [Citations.] Thus, when victims of unlawful sexual conduct experience physical injury and accompanying pain beyond that 'ordinarily experienced' by victims of like crimes [citation], such additional, 'gratuitous injury' will support a finding of great bodily injury [citation]." (*Id*. at p. 66.) The Supreme Court held the evidence that the 13-year-old victim became pregnant was sufficient evidence to support the great bodily injury finding. (*Ibid*.)

These cases convince us that Victim suffered bodily harm within the meaning of section 667.61. Victim testified she suffered bruises on her arms as a result of Provencio forcing her to the bed so he could sodomize her. She also described rectal bleeding and pain that lasted for a few days as a result of Provencio sodomizing her. While the description of these injuries was sparse, the bleeding and excessive pain described by Victim is comparable to the injuries suffered by the victim in *Escobar*. When combined with the bruising suffered by Victim, we conclude there was a bare minimum of evidence sufficient to support the jury's verdict.

### Section 288.2 Conviction

At the time of the offense, this section prohibited exhibiting harmful matter to a minor with the intent of arousing or gratifying the lust, passions, or sexual desire of the person or the minor, and with the intent of seducing the minor. (§ 288.2, subd. (a).) "Harmful matter" is defined in section 313, subdivision (a) as "matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

Provencio contends the evidence was insufficient to establish the movies shown to Victim met this definition of "harmful matter." Resolution of this issue requires us to

19.

consider two cases, *People v. Powell* (2011) 194 Cal.App.4th 1268 (*Powell*) and *People v. Dyke* (2009) 172 Cal.App.4th 1377 (*Dyke*).

*Dyke* analyzed the effect of a 1988 legislative amendment to the definition of "harmful matter." The appellate court concluded the definition adopted by the Legislature tracked the definition for obscenity established in *Miller v. California* (1973) 413 U.S. 15, 24, with two exceptions. (*Dyke, supra,* 172 Cal.App.4th at pp. 1382-1383). *Miller* established a three-prong test to determine if specific material is obscene and thus subject to regulation by the states without offending the First Amendment. First, the trier of fact must decide if the average person applying contemporary community standards would conclude the material, taken as a whole, appeals to the prurient interest. Second, the trier of fact must determine whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law. Third, the trier of fact must determine whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. (*Miller,* at p. 24; *Dyke,* at p. 1382.)

The first difference between *Miller* and the definition of "harmful matter" contained in section 313 is that section 313 requires the trier of fact to use a statewide standard as the relevant community standard by which the material is evaluated. (*Dyke, supra,* 172 Cal.App.4th at p. 1383.) The second difference is that section 313 requires the trier of fact to determine if the work lacks serious literary, artistic, political, or scientific value *for minors*, i.e., its socially redeeming values must be of a nature that they could be appreciated by a minor. (*Dyke,* at p. 1383.)

*Dyke* also observed that under the definition of "harmful matter" in section 313, the average person applying statewide standards is an average adult applying adult standards, and the determination of whether sexual conduct is depicted or described in a patently offensive way is also made using adult standards. (*Dyke, supra,* 172 Cal.App.4th at p. 1383.)

*Dyke* next turned to the question of whether the defendant's conviction for violating section 288.2 was supported by sufficient evidence. The victim testified that while watching television with the defendant, he changed the channel to a station displaying a naked female dancing, and on another station she observed a man and a woman having intercourse. The lower portions of these individuals' bodies could not be seen. The woman was on top and the upper portions of both the man and woman were unclothed. The victim observed the female dancing for approximately eight minutes and observed the couple having sex for approximately 45 seconds. (*Dyke, supra,* 172 Cal.App.4th at p. 1384.)

The appellate court reversed the conviction. First, the appellate court noted that nudity alone is not obscene. (*Dyke, supra,* 172 Cal.App.4th at p. 1385.) Nor are all depictions of sexual activity obscene. (*Ibid*.) To determine whether a portrayal of sex is patently offensive, the reviewing court must view the material in context and content. (*Ibid*.) The appellate court concluded there was insufficient evidence to support this element of the crime because there was no evidence in the record to explain either the context or content of the material observed by the victim. (*Ibid*.)

The appellate court also observed there was insufficient evidence to permit the jury to conclude the material, when taken as a whole, lacked serious literary, artistic, political, or scientific value for minors because there was no evidence explaining the material observed by the victim or the context of the material. (*Dyke, supra,* 172 Cal.App.4th at p. 1385.) Without such evidence, the trier of fact had no basis to decide whether the material lacked any literary, artistic, political, or scientific value.

*Powell* struggled with the same issues as *Dyke.* The victim told the investigating officer that the defendant showed her a movie that displayed some men's penises and women's vaginas. She also saw sexual activity "and not just kissing" in the movie. (*Powell, supra,* 194 Cal.App.4th at p. 1285.) The victim described the movie as a "nasty" movie. (*Ibid*.) The victim testified the defendant made her watch pornography

and movies that contained sex.  The men would undress the women and have intercourse with the women, but the men's penises were obscured by pixelization.  The victim could see the men and women having sex.  The victim also told friends the defendant made her watch "bad" movies.  (*Id*. at p. 1286.)

There was no other evidence describing the movies.  The defendant argued that since nothing was known about the movies, there was not sufficient evidence to establish the movies were harmful, as that term was defined in section 313 and explained in *Dyke*.  The People argued the jury could infer the movies contained only graphic sexual conduct.  The appellate court observed, however, that there was nothing "in the record that might support the notions that (1) a movie defendant made the victim watch 'contains no plot and functions merely as a vehicle to display sexual acts,' (2) 'movies that show graphic intercourse with genitals obscured are inevitably offensive to the average adult,' (3) pixelization of external genitalia 'is essentially an acknowledgment that the film is directed solely at prurient interests,' or (4) defendant and the victim were watching 'adult oriented premium channels' or equivalent video recorded content."  (*Powell, supra,* 194 Cal.App.4th at p. 1291.)  The appellate court also "agree[d] with defendant that nudity or depictions of sexual intercourse or other sexual activity does not, by themselves, make a movie obscene."  (*Ibid*.)  The appellate court noted that frontal male nudity does not necessarily make a movie obscene.  (*Id*. at pp. 1292-1293.)

"Thus, the victim's accounts of seeing 'bad' and 'nasty' movies featuring 'pornography' are insufficient."  The appellate court concluded, however, that the movies the victim described viewing were "hardcore pornography" "of the type that forms the basis for the offense described in section 288.2 .…"  (*Powell, supra,* 194 Cal.App.4th at p. 1293.)  While acknowledging "the contours of hardcore pornography are not precise," the appellate court noted that "hardcore pornography is distinguished from its more mainstream soft-core counterpart by such things as lewd displays of the penis."  (*Id*. at p. 1294.)

22.

The appellate court acknowledged the victim's vague descriptions of the content of the movies generally could describe displays that fall outside of the definition of "harmful matter" found in section 313. (*Powell, supra,* 194 Cal.App.4th at pp. 1294-1295.) The appellate court concluded, however, there was sufficient evidence to sustain the conviction because "the victim … told [the investigating officer] that in one sexually oriented movie 'some of their men parts and women parts weren't blocked.' Penises, breasts, and vaginas featured in lewd displays as the actors 'did it,' i.e., engaged in sexual activity and not just kissing. Notwithstanding the constitutional and definitional barriers to a conviction under section 288.2, subdivision (a), and the lack of detail in most of the victim's descriptions about the material defendant forced her to watch, we uphold the conviction against defendant's due process challenge because of the victim's description of seeing a movie in which actors engaged in simulated or unsimulated sexual activity while displaying all of those body parts." (*Id*. at p. 1295.)

With these cases in mind, we turn to the testimony by Victim and Waggle. The first instance of exposure to which Victim testified occurred when she tried to play with Provencio's hand-held gaming device. Provencio was not at home, but, when Victim tried to watch a movie on the device, "a bunch of porn things popped up instead." Victim turned off the gaming device.

The other incident described by Victim occurred when Provencio asked her to look at something on his computer. Provencio turned on a video. When Victim tried to walk away, Provencio pulled her back and made her watch. When the prosecutor attempted to obtain a description of the video, Victim stated, "[M]ost of them had more than two people in it. There were, like, different holiday themes, I guess." Victim stated "the girls were dressed in, like, provocative, like, either Valentine's Day things or Christmas."

The prosecution apparently relied on Waggle's testimony to establish the content of the movie since Victim's description did not do so. He described locating "two

pornographic files -- adult pornography video files" on a computer memory storage device. Another memory storage device contained "several adult pornography video files." He found pornographic video files that suggested a Valentine's Day theme and another that suggested a Christmas Day theme. "There was a boy sleeping with his friend's mom type video. There was some girl on girl videos, as well as a girl sleeping with her sister's -- with her friend's brother." Waggle described the videos as "Complete hardcore porn." Waggle also located a file entitled "O.K. Raiders" on an external hard drive that was password protected. That file also contained "adult pornography video files."

Since there was no evidence Victim was shown the file entitled "O.K. Raiders," that file was irrelevant. Similarly, there was no evidence Victim was shown "girl on girl videos," or a "boy sleeping with his friend's mom" video, or "a girl sleeping with her … friend's brother" video. Accordingly, the testimony about those videos also was irrelevant.

No attempt was made to provide the jury with a more detailed description of the contents of the videos mentioned by Victim. Victim did not describe seeing any penises, vaginas, or breasts. The videos were not played for the jury.[5] Nor did Waggle define the term "Complete hardcore porn." So all that we know of the videos described by Victim is that the girls in the videos were dressed provocatively (another undefined term), and, assuming she saw the same two videos described by Waggle (a reasonable inference), the videos contained what Waggle considered to be "Complete hardcore porn."

This court understands what it means when talking about hardcore pornography, and we agree with the *Powell* court that such videos would be contained within the

---

[5]We are not suggesting the videos must be played for a jury to obtain a conviction for violation of section 288.2. We also understand how uncomfortable and unpleasant testifying must have been for Victim. However, since Waggle viewed the videos, he could have provided a description of the contents to the jury.

definition of "harmful matter" found in section 313.  What this court does not know, and what the jury could not possibly know, is how Waggle defined the term "hardcore pornography."  Did Waggle use the term in the same sense most individuals understand the term, or was Waggle unusually sensitive to such issues so that he considered simple kissing and petting to be hardcore pornography, even though the video did not contain any indications of intercourse or even a display of a naked penis, vagina or breasts?  Since neither we nor the jury can answer this question, the conviction cannot stand.

The prosecution was required to prove beyond a reasonable doubt that the videos shown to Victim contained harmful matter as that term is defined in the Penal Code.  The failure to present evidence of what was in the videos prevented the prosecution from meeting this burden.  The state of the evidence presented to the jury was insufficient for the jury to decide whether any of the three prongs of the *Miller* test as codified in section 313 were met by the videos.  Accordingly, the conviction for violation of section 288.2 must be reversed.

## DISPOSITION

The judgment for continuous sexual abuse of a child in violation of section 288.5 is affirmed.  The judgment for displaying harmful matter to a child in violation of section 288.2 is reversed.  The matter is remanded to the trial court for issuance of a new abstract of judgment.

_____

CORNELL, Acting P.J.

WE CONCUR:


_____

GOMES, J.


_____

PEÑA, J.

25.